WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Public Service Company, | No. CV-21-00662-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| EthosEnergy Power Plant Services LLC, et al., | |
| Defendants. | |

## INTRODUCTION

Plaintiff Arizona Public Service Company ("APS") owns and operates the Saguaro Power Plant in Red Rock, Arizona.  In April 2018, APS asked a representative of Defendant Advanced Turbine Support Incorporated ("ATS") to perform a non-destructive examination ("NDE") of six rows of compressor blades associated with one of the plant's combustion turbines.  An NDE does not require any specific method of examination and instead can encompass several different techniques.  Here, two NDE methods are relevant—eddy current testing ("ET") and ultrasonic testing ("UT").

For reasons that are disputed, ATS used the UT method when examining the blades in rows 1-3 and 6 of the turbine and used the ET method when examining the blades in rows 4 and 5.  ATS did not detect any cracks in row 4.  However, about a year later, a blade in row 4 broke off and caused approximately $10 million in damage to the turbine.

In this action, APS asserts various contract and tort claims against ATS, most of which are premised (in one way or another) on ATS's failure to use the UT method when

examining the blades in rows 4 and 5.  Now pending before the Court is ATS's motion for summary judgment.  (Doc. 57.)  For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

I.   Relevant Facts

The facts set forth below are derived from the parties' summary judgment submissions and other documents in the record, with any conflicts viewed in the light most favorable to APS.

APS "is the largest electric utility in Arizona and owns and operates APS Saguaro Power Plant, a natural gas powered station, located in Red Rock, Arizona."  (Doc. 1-3 at 61 ¶ 2; Doc. 18 ¶ 2.)  ATS, which is based in Florida, describes itself as "one of the top generator and turbine inspectors in the world."  (Doc. 1-3 at 62 ¶ 6; Doc. 18 ¶ 6.)

"On April 10, 2018, a borescope inspection of [APS's] Siemens Westinghouse 501AA combustion turbine . . . performed by [ATS] revealed a liberated diaphragm and significant impact damage at rows 4 and 5 of the compressor."  (Doc. 1-3 at 62 ¶ 9; Doc. 18 ¶ 9.)

On April 13, 2018, APS hired EthosEnergy Power Plant Services LLC ("EthosEnergy")—an entity that was originally named as a defendant in this action but has since settled with APS (Doc. 41)—to replace the damaged compressor blades and diaphragms.  (Doc. 60-2 at 14.)  In the course of its work, EthosEnergy removed the blades in rows 4 and 5 and discovered a cracked blade in row 5.  (Doc. 60-5 at 8; Doc. 57-2 at 3.)

On or about April 18, 2018, following EthosEnergy's discovery of the cracked blade, APS representative Mike Stevens ("Stevens") had a discussion with ATS technician Guillermo Gonzalez ("Gonzalez"), who happened to be on site completing a separate work order, about expanding the scope of the work order to include an NDE of rows 1-6 on the turbine.  (Doc. 57-4 at 3 [Gonzalez: "I was inspecting a different unit.  I was doing a borescope inspection on a different unit, not that one."]; Doc. 57-3 at 5 [Stevens: "Guillermo was on site."].)  During his deposition in this case, Stevens provided the

following summary of this conversation with Gonzalez: "So I did speak with Guillermo. And I think that's when we discussed, 'Hey, we need to do NDE.'"  (Doc. 60-5 at 7.) Stevens also "generally" agreed with the description of this conversation appearing in APS's complaint, which was that APS "requested Guillermo Gonzalez of [ATS] perform a NDE on all compressor blades to discover cracks that may exist in the blades."  (*Id.* at 12.)

As a general matter, when determining which type of NDE to perform, ATS relies both on its customers' preferences and on its own expertise.  For example, ATS may "make recommendations [to the customer] based on [its] knowledge" but some customers "tell [ATS] what they want" and/or "ask for recommendations."  (Doc. 60-6 at 10-11.)  If ATS disagrees with a customer's request, ATS "[t]ypically . . . would make a recommendation if it's something we do have experience with."  (*Id.* at 11.)  Through that recommendation, ATS seeks to "give as much information as [it] can as to why that recommendation is made and allow that customer to make an educated decision on what they want to do."  (*Id.*) Among the factors ATS considers when deciding which NDE method to employ are the "cleanliness of the component and different issues" like the "surface condition."  (*Id.* at 7.)[1]

On April 19, 2018, Gonzalez emailed a co-worker, ATS inspection specialist Dustin Irlbeck ("Irlbeck"), and asked: "What would the preferred inspection method and procedure be if they request ND[E] of the removed and installed rotor blades?"  (Doc. 60-12 at 1.)  A few minutes later, Irlbeck responded: "I would recommend phased array UT for all in-situ inspections and PAUT with conventional UT from the bottom for removed blades.  We could also perform [sic] eddy current [ET] on the removed blades."  (*Id.*)[2]  For

---

[1]     There are many different inspection methods, including "liquid penetrant inspections," "magnetic particle inspections," "eddy current inspections," and "ultrasonic inspections."  (Doc. 60-6 at 4.)

[2]     Consistent with his April 19, 2018 email, Irlbeck testified during his deposition that when a blade is removed, ATS's "best practices" generally involve two methods of examination, ET and UT.  (Doc. 60-6 at 9 ["So, again, they complement each other."].) Irlbeck further explained that when a blade remains inside the compressor (also known as "in situ"), ATS "can't get to the surfaces because they are below the rotor wheel," so, "at that point we do the [UT]."  (*Id.*)

- 3 -

context, a UT examination is "volumetric," meaning "you can see discontinuities beneath the surface." (Doc. 60-6 at 5.) In contrast, an ET examination has an "edge effect," meaning that it is "sensitive to geometry changes, but it's still very sensitive to small discontinuities at and near the edges." (*Id.* at 6.) As Irlbeck explained during his deposition in this case, the risk with the ET method is that when it is performed near the edges of a blade, it "sometimes gets blended in with the geometry indication so that the inspector has to be able to see that." (*Id. See also id.* at 8 [explaining that UT can "see deeper into a component" whereas ET "has more of a skin effect"].)

One of the disputed issues in this case is whether Irlbeck's recommendation to Gonzalez—that is, to use the UT method when examining all six rows of blades—was ever relayed to Stevens. Irlbeck testified that he never provided this recommendation to Stevens "in writing" and also did not, to his "best recollection," ever speak with Stevens about the recommendation. (Doc. 60-6 at 13.) Gonzalez, too, stated "I don't know" when asked to identify "what recommendations, if any, [ATS] made to Mike Stevens or anyone else at APS Saguaro about which nondestructive examination should be done on this unit." (Doc. 57-4 at 4.) Finally, Stevens's testimony on this topic was somewhat equivocal and inconsistent. At one point during his deposition, Stevens stated "Not that I recall" when asked whether there was "any discussion . . . of the benefits . . . and drawbacks of both methods at that point in time." (Doc. 60-5 at 10.) However, during a different point in his deposition, Stevens disagreed with the suggestion that he had specified the examination methods ATS should use when performing the NDE and indicated that the examination methods that were ultimately used (*i.e.*, ET method on rows 4 and 5 and UT method on rows 1-3 and 6) were based on recommendations he had received from ATS:

> Q: So it's my understanding . . . that ATS agreed to do [UT] on rows 1 through 3 and 6 and agreed to do [ET] on rows 4 and 5. Is that right?
>
> A: I don't know if they agreed to do that. I think that's what was—*that's what we understood to be the correct inspection from them.*

(*Id.*at 13, emphasis added.) Thus, when the conflicting evidence on this point is viewed in

the light most favorable to APS, it suggests that even though ATS privately believed the UT method should be used when examining all six rows, ATS provided a different recommendation—to use the ET method when examining rows 4 and 5—to APS.[3]

This issue dovetails with another disputed issue in this case, which is whether Stevens specified the examination method that ATS should use when performing the NDE. On this point, Gonzalez testified that Stevens instructed him to perform "[ET] on the ones that were out of the unit and [UT] on the ones that remained installed on the unit." (Doc. 57-4 at 4.)[4]  Meanwhile, Stevens did not directly dispute Gonzalez's testimony on this point—instead, Stevens testified that he wouldn't "usually" specify the examination method to be used "without a request for recommendation." (Doc. 60-5 at 6.)  Stevens also clarified that *if* any recommendations related to UT testing had been made to him, he would not have rejected those recommendations.  (*Id.* at 15 [Q: "Since this litigation was filed, have you become aware that ATS has taken the position that they recommended to you in April of 2018 that UT be done on rows 4 and 5 of the compressor and that you said no?" A: "And that I said no?"  Q: "Correct.  Are you aware that that's what they're claiming?" A: "I'm aware that's what they're claiming."  Q: "Is there any truth to that whatsoever?" A: "No."].)

Given this backdrop, there is no genuine factual dispute about what ultimately happened—Stevens instructed Gonzalez to use the ET method when examining rows 4 and 5.  Gonzalez's testimony on this point is unequivocal and Stevens's testimony is not

---

[3]     The tentative ruling issued before oral argument did not focus on the second passage from Stevens's deposition.  During oral argument, APS's counsel correctly identified it as evidence that, at least when construed in the light most favorable to APS, could be viewed as supporting APS's position that ATS made a recommendation to perform ET testing (rather than UT testing) on rows 4 and 5.  This order has been updated accordingly.  The update also obviates APS's request to supplement the summary judgment record with additional portions of Stevens's deposition testimony (which neither party provided during the original round of summary judgment briefing) discussing whether ATS made the recommendation to use the ET method on rows 4 and 5.

[4]     Irlbeck also testified that Stevens provided these instructions.  (Doc. 57-2 at 6 ["It's my understanding that [Stevens] decided to just do the [ET] on the removed components . . . ."].)  However, when further questioned on this topic, Irlbeck indicated that he lacked any personal knowledge of Stevens's statements and was relying on what Gonzalez had told him.  (*Id.* [Q: "Do you know to whom [Stevens] conveyed that information with [ATS]?"  A: "I believe he conveyed that to the inspector on site, [Gonzalez]."].)

1    contradictory.  Instead, Stevens's testimony only raises a genuine dispute over *why* he

2    instructed Gonzalez to use the ET method on rows 4 and 5.  As discussed, as to that issue,

3    the evidence when construed in the light most favorable to APS is that Stevens provided

4    the instruction because Gonzalez had identified it as the recommended course of action

5    (even though Irlbeck had privately advised Gonzalez that a different course of action would

6    be preferable).

7            Ultimately, ATS agreed to perform the NDE and used the ET method when

8    examining rows 4 and 5 and the UT method when examining rows 1-3 and 6.  (Doc. 60-5

9    at 13.)  APS has presented evidence, which must be credited for summary judgment

10   purposes, that this work was governed by the terms of a preexisting purchase order between

11   the parties—in APS's view, Gonzalez and Stevens verbally agreed to add the NDE to the

12   scope of work under the purchase order.  (Doc. 1-3 at 67 ¶ 46; Doc. 60 at 7, 10; Doc. 60-5

13   at 12 [Stevens, "generally" agreeing with the accuracy of the allegations in the FAC on this

14   point].)   As relevant here, Section 17 of the purchase order is entitled "Supplier's

15   Warranties."  (Doc. 60-2 at 39-40.)  In Section 17.1, ATS warranted "that the Services (a)

16   shall be performed and completed in a thorough, workmanlike manner; (b) meet the

17   requirements of the Order; and (c) be of the standard and quality generally recognized and

18   accepted within its industry or profession throughout the United States."  (*Id.*)  Elsewhere,

19   the purchase order defines "Services" as "[a]ll services, including, labor, repair and

20   maintenance, consulting, or engineering services, that [ATS] is required to perform under

21   the Order."  (*Id.* at 33.)  Finally, separate from the concept of "Services," the purchase

22   order also contains various warranties concerning "Deliverables," which are defined as

23   "[a]ll materials and physical items that are delivered by [ATS] to [APS] as part of the

24   Services, including, those described in the Order."  (*Id.*)  In Section 17.1, ATS warranted

25   "that the Deliverables shall (a) be new . . . and of good quality; (b) be free of defects in

26   design except to the extent the Deliverables are manufactured in accordance with detail

27   designs provided by [APS] as set forth in the Order; (c) be free from defects in material

28   and workmanship; (d) meet the requirements of the Order; and (e) be safe and suitable for

the ordinary purposes for which the Deliverables are to be used." (*Id.* at 40.)  Additionally, in Section 17.2, ATS "acknowledge[d] that [APS] may rely on [ATS's] skill and judgment to select or furnish the Deliverables for the particular purpose for which the Deliverables are intended.   [ATS] warrants that the Deliverables will be suitable for, and will accomplish, the purposes for which they are intended." (*Id.*)[5]

As for the NDE itself, ATS acknowledges in its motion papers that "no cracks were detected in the row 4 blades."  (Doc. 57 at 2.)  However, on March 20, 2019, a crack in a row 4 compressor blade caused significant damage to the turbine.  (Doc. 57-3 at 9; Doc. 60-8 at 6 ¶ 8.)  During the ensuing "root cause" investigation of the turbine's failure, Irlbeck admitted to Stevens that "he thought the incorrect inspections were performed" and that "UT should have been performed . . . on the row 4 and 5 blades."  (Doc. 60-5 at 14.)  APS's expert, Dr. Joseph Tucker, opines that the "row 4 crack" "was detectable by ATS on April 20, 2018" and "would more likely than not have been detected . . . had ATS performed [UT] consistent with its best practices."  (Doc. 60-8 at 6 ¶ 8.)

II.   Procedural History

On March 18, 2021, APS filed a complaint in Maricopa County Superior Court. (Doc. 1-3 at 6-18.)

On April 8, 2021, APS filed its operative pleading, the first amended complaint ("FAC").  (*Id.* at 61-73.)

On April 16, 2021, EthosEnergy filed a notice of removal.  (Doc. 1.  *See also* Doc. 9 [amended notice of removal].)

On February 14, 2023, ATS filed its motion for summary judgment.  (Doc. 57.)  The motion is now fully briefed.  (Docs. 60, 65.)

On August 4, 2023, the Court issued a tentative order.  (Doc. 67.)

On August 15, 2023, the Court held oral argument.  (Doc. 68.)

…

---

[5]      The tentative ruling issued before oral argument did not address the purchase order and the warranties arising under it.  During oral argument, APS's counsel raised several points regarding the warranties.  This order has been updated accordingly.

# DISCUSSION

I. <u>Legal Standard</u>

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Id.* at 1102-03. But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to produce evidence to support its claim or defense. *Id.* at 1103. The nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and emphasis omitted); *see* Fed. R. Civ. P. 56(c)(1). There is no issue for trial unless enough evidence favors the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.   Breach Of Contract

A.   **The Parties' Arguments**

In Count Two of the FAC, APS asserts a claim for breach of contract. (Doc. 1-3 at 66-68 ¶¶ 42-51.)[6] The gist of this claim is that ATS entered into an "agreement to perform the appropriate NDE inspection to detect cracks in the compressor blades" and breached that agreement "by performing [ET] on the row 4 and 5 blades instead of [UT]." (*Id.* at 67 ¶¶ 48-49.)

ATS moves for summary judgment on this claim for two reasons. (Doc. 47 at 3-7.) First, ATS argues that, at bottom, "APS's claims sound in tort not in contract" and that even if the contracted-for "services may have been provided in a negligent manner," this "does not transform a negligence claim into a breach of contract claim." (*Id.* at 3-5.) Second, and alternatively, ATS argues that the contract claim is premised on the assumption that "Stevens did not direct ATS to only perform the [ET] method" but this premise is "not supported by the record" because it is undisputed, based on the deposition testimony of Stevens, Gonzalez, and Irlbeck, that "Stevens instructed ATS to only perform the [ET] method." (*Id.* at 5-7.)

In response, APS argues that "at a very minimum, genuine issues of material fact" exist "regarding the agreement between the parties and whether ATS breached that

_____

[6]   Count One applies only to settling defendant EthosEnergy. (Doc. 1-3 at 64.)

agreement by failing to conduct UT as well as ET on the subject row 4 blades that failed." (Doc. 60 at 7-9.)  As for the formation of the agreement, APS contends that, "consistent with the [parties'] course of dealing," the parties entered a verbal agreement that Gonzalez would "perform [the] NDE on compressor blades in rows 1-6."  (*Id.* at 7.)  According to APS, performing an NDE involves the following steps: (1) evaluating which NDE method to use (UT or ET) depending on "access, size, cleanliness and surface condition of the components"; (2) if "ATS has greater access to a blade . . . it is ATS' best practice to recommend and perform both ET and UT to detect any deficiencies"; and (3) "if a customer requests a certain type of NDE to be performed and ATS believes that some other type of NDE should be performed instead, ATS's best practice is to make a recommendation to perform the other type of NDE and advise the customer why ATS is making that recommendation."  (*Id.* at 8, emphases omitted.)  APS thus contends that ATS breached the agreement by (1) not recommending both ET and UT, (2) not providing that recommendation in writing, and (3) not using the UT method when examining the blades in rows 4 and 5.  (*Id.* at 8-9.)  In summary, APS's theory is "the factual record establishes the existence of a contract between [APS] and ATS by which ATS agreed to perform NDE on the Turbine's compressor blades in April 2018, which necessarily encompassed ATS using its NDE expertise and following its own best practices to perform both ET and UT on the removed row 4 and 5 Turbine blades . . . and that ATS breached that contract by failing to perform UT on the row 4 and 5 blades."  (*Id.* at 10.)

In reply, ATS argues that "APS has not presented enough evidence to establish that a contract existed between the Parties because APS has not presented sufficiently specific contract terms such that the obligations of the Parties are ascertainable."  (Doc. 65 at 4.)  More specifically, ATS contends that "[t]here is no evidence of an agreement or specific promises to perform 'appropriate' NDE inspections.  There is also no evidence that Gonzalez, or any other ATS employee, specifically agreed that he would recommend an NDE inspection method.  There is evidence that ATS agreed to perform NDE inspections of the row 1-6 compressor blades, but that is the only promise for which there is evidence.

ATS kept that promise.  Thus, ATS performed the allegedly contracted for services."  (*Id.* at 5.)  Alternatively, ATS argues that any claim premised on the allegation that "ATS performed the NDE inspections in a negligent or inappropriate manner" sounds in tort, not contract.  (*Id.*)

B.   **Analysis**

Under Arizona law, a party asserting a claim for breach of contract must prove (1) the existence of the contract, (2) a breach of that contract, and (3) resulting damages.  *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004).  "For an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that obligations involved can be ascertained."  *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 677 P.2d 1317, 1320 (Ariz. Ct. App. 1983) (quoting Restatement (Second) of Contracts § 50).

As an initial matter, although ATS broadly asserts that "no contract was formed," ATS seems to acknowledge that it entered into a contract with APS to perform some form of an NDE.  (*See, e.g.*, Doc. 57 at 2 ["APS ultimately elected to have ATS perform the NDE inspections."]; Doc. 65 at 5 ["There is evidence that ATS agreed to perform NDE inspections of the row 1-6 compressor blades, but that is the only promise for which there is evidence."].)  The evidence supports this conclusion.  Gonzalez and Stevens both testified that they had a conversation in which Stevens authorized Gonzalez to perform an NDE on blades 1-6 and Gonzalez agreed to do so.  (Doc. 60-5 at 7 [Stevens: "So I did speak with Guillermo.  And I think that's when we discussed, 'Hey, we need to do NDE.'"]; Doc. 57-4 at 3-4 [Gonzalez: "I was just asked to do the inspection, you know, that we did, eddy current and ultrasonic, on it."].)  Stevens also testified that he and Gonzalez agreed the NDE would simply be added to the scope of work under a preexisting purchase order.  (Doc. 60-5 at 12 ["[APS] and [ATS] added to this scope of work by way of a verbal discussion pursuant to which [Stevens] requested Guillermo Gonzalez of [ATS] perform a NDE on all compressor blades to discover cracks that may exist in the blades."].)  Accordingly, the crux of the parties' dispute is over the *scope* of the agreement (and

whether it was breached), not the *existence* of an agreement.

On that issue, APS's theory is that the parties' agreement was that ATS would perform a particular type of NDE—specifically, an NDE utilizing the UT method in relation to rows 4 and 5—and at a minimum encompassed an agreement by ATS to provide a recommendation as to which NDE method would be used. Having carefully reviewed the materials submitted by the parties, the Court agrees with ATS that there is insufficient evidence from which a reasonable juror could conclude that the agreement took the form APS suggests. During his deposition, Gonzalez specifically testified that Stevens requested "[ET] on the [blades] that were out of the unit and [UT] on the ones that remained installed on the unit." (Doc. 57-4 at 4.) Stevens, meanwhile, did not dispute Gonzalez's testimony on this point. Although Stevens clarified that he would not have rejected a recommendation to perform a UT examination on all six rows *if* such a recommendation had been made to him (Doc. 60-5 at 15), there is no evidence that such a recommendation was ever made to Stevens—to the contrary, Stevens's testimony on this point (although equivocal and not always internally consistent) at most establishes that Gonzalez recommended the use of the ET method on rows 4 and 5 and Stevens then agreed with this recommendation and instructed ATS to proceed in accordance with it. (Doc. 60-5 at 13 ["[T]hat's what we understood to be the correct inspection from them."])[7]

To the extent APS offers evidence that ATS's "best practices" call for the use of the UT method (or at least a recommendation as to the use of the UT method) when performing the type of examination at issue here, the problem is that APS has not offered any evidence that ATS agreed to follow those best practices in relation to this particular engagement. During oral argument, APS asserted that the warranties appearing in Sections 17.1 and 17.2 of the purchase order support its position on this issue, but a close inspection of the relevant contractual language shows otherwise. As discussed in the statement of facts, the purchase

---

[7]     The testimony of Gonzalez and Irlbeck does not support APS's position on this point. As discussed in the statement of facts, Gonzalez said "I don't know" when asked to identify any recommendations that had been made to Stevens (Doc. 57-4 at 4) and Irlbeck denied making any recommendations directly to Stevens (Doc. 60-6 at 13).

order draws a distinction between "Services" and "Deliverables." It cannot be reasonably disputed that the conduct at issue here—performing an NDE on rows 1-6—was a "Service."[8] The only relevant warranty provided in Sections 17.1 and 17.2 in relation to "Services" is that "the Services (a) shall be performed and completed in a thorough, workmanlike manner; (b) meet the requirements of the Order; and (c) be of the standard and quality generally recognized and accepted within its industry or profession throughout the United States." (Doc. 60-2 at 39-40.) In other words, the contract does not obligate ATS to make recommendations as to the type of "Service" to be performed—it simply provides that, once ATS has agreed to perform a particular service, it will do so in a thorough, workmanlike manner, meet the requirements of the order, and perform *that service* in a manner that conforms with industry standards. *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009) ("[T]he interpretation of a contract is a question of law, which this court reviews de novo."). The only warranty that is even in the ballpark of providing recommendations is Section 17.2, which provides that APS "may rely on [ATS's] skill and judgment to select or furnish the Deliverables for the particular purpose for which the Deliverables are intended." (*Id.* at 40.) But that warranty is not implicated here because, again, an NDE is a service, not a deliverable.[9]

The bottom line is that although ATS's "best practices" may be helpful to APS in

---

[8]    The first page of the purchase order specifies that it is for "Services: ATS" and identifies the scope of work as "Borescope Inspection and Non-Destructive Evaluation of Saguaro GT 2 Compressor Components." (Doc. 60-2 at 31.) Additionally, in the FAC, APS characterizes the NDE as an "inspection" that "was included within the price for services charged by [ATS] under [the purchase order]." (Doc. 1-3 at 67 ¶ 46.)

[9]    During oral argument, APS's counsel seemed to advance the theory that ATS needed to bring particular machines to the worksite to perform the NDE and the act of bringing those machines qualified as the provision of a "Deliverable" that triggered Section 17.2. APS forfeited this argument by failing to raise it in its motion papers, but the argument also fails on the merits. As discussed elsewhere in this order, the undisputed evidence establishes that Stevens ultimately asked ATS to perform an NDE consisting of the use of the ET method on rows 4 and 5 and the use of the UT method on rows 1-3 and 6. To the extent Section 17.2 entitled APS to rely on ATS to use its skill and judgment to select the appropriate machines (*i.e.*, "Deliverables") to perform that contracted-for "Service," there is no evidence that ATS somehow breached that warranty by using or recommending the use of the wrong machine for performing an ET examination. Rather, APS's theory is that ATS should have been performing an altogether different "Service" (*i.e.*, an NDE consisting of the use of the UT method on all six rows).

relation to some of its other claims in this case, they do not help APS in relation to its contract claim—there is simply no evidence that conformance with those practices was part of the agreed-upon bargain between the parties. *See generally Valley Forge Ins. Co. v. Sam's Plumbing, LLC*, 207 P.3d 765, 767 (Ariz. Ct. App. 2009) ("Contract law protects the expectation that the parties will receive the benefits of their bargain and encourages the efficient private ordering of liabilities by allowing parties to negotiate and distribute their respective responsibilities, while tort law promotes safety and protects personal and property rights by imposing a baseline duty of care. . . . [C]ontract law focuses on standards of quality as defined by the contracting parties; tort law on the objective reasonableness of certain conduct and the actual harm it causes."). *Cf. Kimminau L. Firm, P.C. v. Hoopes*, 2023 WL 3319012, *3 (Ariz. Ct. App. 2023) ("'[E]ven where there is an express contract between the professional and the client, an action for breach of that contract cannot be maintained if the contract merely requires generally that the professional render services.' Rather, as Kimminau argued below, '[o]nly if there is a specific promise contained in the contract can the action sound in contract, and then only to the extent the claim is premised on the nonperformance of that promise.' 'The key word is 'nonperformance,' and the distinction to be drawn is that between nonfeasance and malfeasance.' The fact that an attorney may have carried out a task 'in a negligent manner, in violation of the duty imposed on him by law to represent his client in accordance with the applicable standard of care, does not change the gravamen of the action from tort to contract.'") (internal citations omitted).[10]

In sum, the undisputed evidence establishes that, with Stevens's assent, the contract was to perform an NDE consisting of the use of the UT method when examining rows 1-3 and 6 and the use of the ET method when examining rows 4 and 5. Although the parties dispute why Stevens instructed ATS to perform that service (and whether it was the

---

[10]     *See generally Pyeatte v. Pyeatte*, 661 P.2d 196, 200 (Ariz. Ct. App. 1982) ("[I]n order to be binding, an agreement must be definite and certain so that the liability of the parties may be exactly fixed. Terms necessary for the required definiteness frequently include time of performance, place of performance, price or compensation, penalty provisions, and other material requirements of the agreement.").

appropriate service), it is undisputed that ATS ultimately performed that service. Thus, APS cannot establish the sort of "nonfeasance" that is necessary to prevail on a contract claim. *Kimminau L. Firm, P.C.*, 2023 WL 3319012 at *3. Given this determination, it is unnecessary to resolve ATS's alternative argument that a contract claim could never lie in this circumstance (due to the overhang of tort law). ATS is entitled to summary judgment on Count Two.

III.   Negligent Misrepresentation

    A.   **The Parties' Arguments**

In Count Three of the FAC, APS asserts a claim for negligent misrepresentation. (Doc. 1-3 at 68-71 ¶¶ 52-72.) The two alleged misrepresentations underlying this claim are (1) ATS's representation "[t]hat it would perform a NDE on the row 4 and 5 compressor blades which would be able to detect cracks"; and (2) ATS's representation in the "report" issued following the NDE "[t]hat there were no cracks in the row 4 compressor blades inspected by [ATS]." (*Id.* at 69-70 ¶¶ 63, 66.)

ATS argues that "APS's negligent misrepresentation claim should be dismissed because discovery has not supported APS's allegation that ATS elected to only use the [ET] method. . . . By contrast, ATS's story—that ATS recommended the [ET] and [UT] methods, but Stevens elected to only have the [ET] method—is supported by Irlbeck's and Gonzalez's deposition testimony and uncontested by Stevens . . . . Accordingly, . . . there is no evidence that ATS did not exercise the appropriate standard of care." (Doc. 57 at 8.)

In response, APS argues that "there is an abundance of evidence—including from the admissions of ATS' own employees—establishing that ATS completely disregarded its own, self-described standard of care, i.e., its best practices, in breach of its contract with [APS] to perform the NDE, which necessarily included performance of both ET and UT on the removed row 4 and 5 Turbine blades." (Doc. 60 at 11.)

In reply, ATS argues that "APS's Response fails to include citations to any case law to support its position." (Doc. 65 at 6.) ATS further contends that APS "cannot identify what false information ATS provided" because "APS has not presented any evidence

establishing that ATS told Stevens, or any other APS employee, that it would perform 'appropriate' NDE inspections.  ATS certainly did not provide a guarantee that it would be able to identify every crack in every blade.  Without evidence that a false representation was made, APS cannot prove a negligent misrepresentation."  (*Id.*)  As a final matter, ATS argues that "APS's claim that ATS's report negligently misrepresented that there were no cracks in the row 4 compressor blades is baseless," both because the "report states that the ET inspections of the row 4 compressor blades did not reveal any cracks" and because ATS generally contests whether a crack was present during the inspection.  (*Id.* at 6 & n.3.)

B.  **Analysis**

Evaluating ATS's entitlement to summary judgment on Count Three is complicated by the unusual manner in which the briefing sequence unfolded.  In its motion, ATS identifies a single reason why summary judgment on Count Three should be granted—because, in light of Stevens's insistence that ATS follow the ET method when examining rows 4 and 5, APS cannot establish that ATS's conduct fell below "the appropriate standard of care."  Although ATS's reply brief purports to identify other reasons why Count Three should be dismissed (and although APS's response brief also includes a broader discussion of the sufficiency of Count Three), the only argument properly before the Court is the single argument raised in ATS's motion.  *See, e.g.*, Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 166 (2020) ("Moving parties are expected to put all of their arguments . . . in the opening brief . . . [and] aren't supposed to include new arguments . . . in their reply briefs."); *Fried v. Surrey Vacation Resorts, Inc.*, 2010 WL 2330272, *1 (W.D. Wisc. 2010) ("[T]he movant in a summary judgment motion cannot introduce new . . . arguments in its reply materials.").  *Cf.* Fed. R. Civ. P. 56(f)(2) (a district court may grant summary judgment "on grounds not raised by a party" only "[a]fter giving notice and a reasonable time to respond").  *See generally Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

That argument is unavailing.  Even if Stevens instructed ATS to follow the ET

method when examining rows 4 and 5, it doesn't follow that APS's claim for negligent misrepresentation necessarily fails.  As noted, that claim is premised in part on ATS's alleged negligence in assuring APS, in the report issued following the examination, that there were "no cracks" in the blades in row 4.  Under Arizona law, "[t]he elements of negligent misrepresentation are: (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage."  *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 411 n.7 (Ariz. Ct. App. 2014) (citation omitted).  In light of the evidence suggesting that ATS knew the UT method would have been preferable to the ET method when searching for cracks in rows 4 and 5, a rational juror could conclude that ATS "failed to exercise reasonable care" by assuring APS on the basis of its ET-only testing—which it knew was suboptimal yet performed at its client's insistence—that there were "no cracks" in row 4.

## IV.   Negligence

### A.   The Parties' Arguments

In Count Four of the FAC, APS asserts a claim for negligence.  (Doc. 1-3 at 71-72 ¶¶ 73-79.)  Among other things, APS alleges that it was owed three duties by ATS: (1) "a duty to perform appropriate service work on the removed compressor row 4 and 5 blades for the purposes of detecting cracks and to notify [APS] of any options, benefits and/or risks which [ATS] based its selection of NDE inspection"; (2) "a duty to select the NDE inspection best suited for detecting a crack in a compressor blade regardless of where the crack may originate"; and (3) a "duty to use reasonable care in the performance of its service work on the removed compressor blades."  (*Id.* at 72 ¶¶ 74-76.)

ATS seeks summary judgment on Count Four for three reasons.  (Doc. 57 at 9-10.)  First, ATS argues that because the parties' contract called for ATS to use the ET method when examining rows 4 and 5, which "is exactly what [APS] got," any negligence claim

- 17 -

necessarily fails.  (*Id.* at 9.)  Second, in a related vein, ATS argues that it only owed APS the third duty alleged in the complaint (*i.e.*, the duty to use reasonable care in the performance of its service work), because that duty "is implied" by the contractual agreement between the parties, and that it could not have owed the other two duties because they are contrary to the contractual terms that APS "specifically instructed" ATS to follow.  (*Id.* at 9-10.)  Third, ATS argues that APS lacks any evidence of a breach of the third duty because (1) "ATS informed APS of additional NDE methods that could be used, but APS refused"; and (2) "APS has not alleged that ATS performed the [ET] method inappropriately or insufficiently such that ATS breached its alleged duty of reasonable care when performing the [ET] method."  (*Id.* at 10.)

In response, APS argues that ATS's arguments related to negligence are a "rehash of ATS' first contract-based argument."  (Doc. 60 at 11.)  According to APS, "ATS had the duty to perform the appropriate and proper NDE on the Turbine's compressor blades, consistent with ATS' best practices" and "ATS breached that duty by failing to perform UT on the row 4 and 5 blades and by failing to advise APS of the appropriate NDE to perform, which included UT in addition to ET on the row 4 and 5 blades—as instructed by ATS' Dustin Irlbeck."  (*Id.*)  In a related vein, APS argues that ATS's duty arguments "rel[y] upon circular reasoning, arguing that because it was only asked to perform ET, it could not have breached any duty of care.  The notion that a customer who hires a contractor to do work is in a position to dictate the contractor's means and methods when the contractor undoubtedly has superior knowledge given his expertise is nonsensical."  (*Id.* at 12.)  APS also argues that "there is overwhelming evidence that ATS breached its duty of care by failing to perform the appropriate NDE on the removed row 4 and 5 blades which included UT under the circumstances and according to ATS' own best practices."  (*Id.* at 13.)

In reply, ATS contends that "a duty of reasonable care is the only duty that APS has proven."  (Doc. 65 at 6.)  ATS then contends, for the first time, that APS needed to present "expert opinions to establish the applicable standard of care," which APS failed to do, and

that APS cannot rely on ATS's own "best practices" to establish the standard of care.  (*Id.* at 7.)  Finally, ATS reiterates its argument that there is "no evidence that ATS failed to use reasonable care when performing its NDE inspection services for APS.  Specifically, it was not negligent for ATS to perform the NDE inspection services that APS demanded."  (*Id.* at 8.)

B.     **Analysis**

ATS's request for summary judgment on Count Four fails for similar reasons as its request for summary judgment on Count Three—although ATS belatedly raises new arguments in its reply brief concerning why the claim may be subject to dismissal, the arguments raised in its motion (which are the only arguments properly before the Court) are unavailing.

More specifically, ATS cites no legal authority in support of its first argument, which is that because it satisfied its contractual obligation to APS (*i.e.*, to use the ET method when examining rows 4 and 5), any negligence claim necessarily fails.  This argument is also inconsistent with some of the arguments that ATS advanced when seeking the dismissal of Count Two.  As ATS correctly noted in relation to that claim (and as is discussed in more detail in Part II above), contract claims are distinct from tort claims and are evaluated under different standards.  *See, e.g.*, *Valley Forge Ins. Co.*, 207 P.3d at 769 (noting that a party's "general duty under tort law . . . to exercise reasonable care in any work undertaken" is "separate from any contractually assumed obligation"); *Rawlings v. Apodaca*, 726 P.2d 565, 574 (Ariz. 1986) (noting that "[t]ort obligations" should generally be construed as "apart from and independent of [contractual] promises made . . . [by] the parties") (citation omitted).  *See also Macy's, Inc. v. H&M Construction Co., Inc.*, 843 F. App'x 841, 842 (9th Cir. 2021) ("A contractor may be liable in both contract and tort for its negligent actions, but the claims are fundamentally different . . . .  Even when an express contract exists between the parties, Arizona courts consistently identify the standard of care in a negligence action against a professional as the duty to act as a reasonable professional would under the circumstances."); *QC Constr. Prods., LLC v. Cohill's Bldg. Specialties,*

*Inc.*, 423 F. Supp. 2d 1008, 1015 (D. Ariz. 2006) ("Generally, contract law enforces the expectancy interests between contracting parties and provides redress for parties who fail to receive the benefit of their bargain. . . .  Tort law, in contrast, seeks to protect the public from harm to person or property.") (quoting *Carstens v. City of Phx.*, 75 P.3d 1081, 1083 (Ariz. Ct. App. 2003)).  The Court acknowledges that there may be some circumstances where the existence of a contractual relationship between the parties precludes a tort claim arising from one party's performance of its contractual obligations, such as when the economic loss rule ("ELR") applies,[11] but ATS has made no effort to raise and develop such a case-specific summary judgment argument here—instead, its first argument rises and falls on the overbroad (and unsupported) theory that the failure of APS's contact claim necessarily precludes any tort liability.

ATS's first argument is also inconsistent with its second argument, which addresses whether a duty of care—which is an essential element of a negligence claim[12]—exists. Although ATS disputes the existence of two of the three duties alleged in APS's complaint, it concedes that it owed the third alleged duty to APS—a "duty to use reasonable care in the performance of its service work on the removed compressor blades"—"because such a duty is implied in a contractual agreement between parties."  (Doc. 57 at 10.  *See also* Doc. 65 at 6 ["That ATS owed a duty of reasonable care is the only duty that APS has proven."].)  It is therefore unnecessary to resolve, at least at this stage of the case, the parties' dispute regarding the existence of the other two alleged duties.

ATS's final argument is that "APS has not rallied the evidence necessary to support

---

[11]   *See generally BMO Harris Bank NA v. Corley*, 2022 WL 4781944, *11 (D. Ariz. 2022) ("The economic loss rule ('ELR') limits a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property.  The doctrine is not applied mechanically, and instead requires the court to consider the relevant policy concerns presented by the individual factual situation.  One such policy consideration is the different purposes that contractual and tort remedies serve . . . .  [T]he borders of the rule are hazy because courts are struggling to determine precisely which tort claims are barred . . . .") (cleaned up).

[12]   *Cal-Am Properties Inc. v. Edais Eng'g Inc.*, 509 P.3d 386, 389 (Ariz. 2022) ("A negligence claim requires proof of four elements: '(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages.'") (quoting *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007)).

that ATS breached its duty of care to APS." (Doc. 57 at 10.)  ATS then identifies two, and only two, reasons why APS will be unable to establish breach.  The first is that ATS's representatives informed Stevens about the merits of using the UT method, only for Stevens and APS to "refuse[]" to follow that recommendation.  (*Id.*)  The problem with this argument is that the evidence, construed in the light most favorable to APS, does not support ATS's premise—a reasonable juror could conclude that although Irlbeck told Gonzalez that the UT method would be preferable, this recommendation was never relayed to Stevens.  (Doc. 60-6 at 13 [Irlbeck, testifying that he never provided his recommendation to Stevens "in writing" and could not recall ever providing it to Stevens verbally]; Doc. 57-4 [Gonzalez, answering "I don't know" when asked to identify "what recommendations, if any, [ATS] made to Mike Stevens or anyone else at APS Saguaro about which nondestructive examination should be done on this unit"].)  Indeed, Stevens's testimony, although equivocal and perhaps internally inconsistent, suggests that Gonzalez recommended the use of the ET method on rows 4 and 5, which in turn prompted Stevens to agree to this recommended course of action.  (Doc. 60-5 at 13.)

ATS's other no-breach argument is that "APS has not alleged that ATS performed the [ET] method inappropriately or insufficiently" (Doc. 57 at 10), but this is a *non sequitur* in light of APS's actual theory of liability, which is that the duty of reasonable care included using or at least making recommendations concerning the UT method.

ATS waited until its reply to raise what the Court perceives to be a potentially winning argument, which is that APS needed to retain an expert to establish that the standard of care in this context requires using the UT method (or at least making recommendations as to that method) and, thus, cannot simply point to ATS's own "best practices" as establishing the relevant standard of care.  *Macy's, Inc.*, 843 F. App'x at 842-43 ("It is a plaintiff's burden to establish the standard of care by presenting evidence of the accepted professional conduct.  Expert testimony is required to establish the standard of care for a professional if the 'factual issues are outside the common understanding of jurors.'") (citations and internal quotation marks omitted).  However, this claim—which

1    APS has never had a chance to address—is not properly before the Court at this juncture.

2    Gensler, *supra*, Rule 56, at 166; *Fried*, 2010 WL 2330272 at *1; *Zamani*, 491 F.3d at 997.

3         Given the unavailing nature of the specific arguments raised in ATS's motion,

4    coupled with the general rule that the element of breach in a negligence action is a "factual

5    matter" that is "usually decided by the jury," *Gipson*, 150 P.3d at 230 & n.1, ATS has not

6    established an entitlement to summary judgment on Count Four.

7    V.    <u>Assumption Of Duty</u>

8         A.    **The Parties' Arguments**

9         In Count Five of the FAC, APS asserts a claim entitled: "Additionally or in the

10   Alternative, Gratuitous Undertaking."  (Doc. 1-3 at 72-73 ¶¶ 80-87.)  Here, APS alleges

11   that ATS "undertook the duty to perform appropriate service work on the removed

12   compressor row 4 and 5 blades for the purposes of detecting cracks and to notify [APS] of

13   any options, benefits and/or risks upon which [ATS] Support based its selection of NDE

14   inspection," that ATS breached that duty, and that the breach is actionable under the

15   Restatement (Second) of Torts § 323.  (*Id.*)

16        ATS begins by arguing that APS's "characterization of [this] claim is imprecise"

17   and that the claim is actually "referred to as an assumption of the duty in Arizona."  (Doc.

18   57 at 10.)  The sole ground on which ATS seeks summary judgment on this claim is that

19   "[i]f ATS assumed a duty to APS, it was not breached" because "[t]he parties contracted

20   for ATS to perform the [ET] method only" and "APS has not alleged that ATS erroneously

21   executed that method."  (*Id.* at 11.)

22        In response, APS "incorporates by reference its arguments above" and further

23   argues that "ATS had the duty pursuant to its own best practices to competently select the

24   appropriate NDE to perform on the row 4 and 5 blades (which included UT as admitted by

25   ATS), and to recommend to [APS] that UT be performed on those blades (which ATS

26   internally acknowledged on April, 2018 as well as to [APS] for the first time after the

27   Turbine failure occurred)."  (Doc. 60 at 13-14, emphases omitted.)

28        In reply, ATS argues that APS's "assumption of the duty claim is based on the same

assertion as its other claims" and "fails for the same reasons." (Doc. 65 at 8.) More specifically, ATS contends that "APS failed to meet its burden to prove duty or the applicable standard of care" and that it is "clear that ATS did not breach a duty of reasonable care when performing NDE inspection services on the row 4 and 5 compressor blades." (*Id.*)

### B.    Analysis

ATS's request for summary judgment on Count Five fails for the similar reasons as its request for summary judgment on Count Four. The only argument fairly raised in ATS's motion (as contrasted with its reply brief) is that its duty of reasonable care was only to perform the contracted-for service (*i.e.*, to use the ET method when examining rows 4 and 5), which is a duty it fully performed. But as with Count Four, ATS cites no authority to support the proposition that the terms of the contract necessarily define the standard of care in this context. Nor would such an approach make sense, given the disparate purposes of (and different standards governing) tort and contract law. *See generally Lips v. Scottsdale Healthcare Corp.*, 229 P.3d 1008, 1010 (Ariz. 2010) (discussing § 323 and explaining that "the common law imposes a duty of reasonable care on a party who voluntarily undertakes to protect persons or property from physical harm"). There may be other reasons why Count Five will ultimately fail, but ATS does not raise them in its motion.

Accordingly,

**IT IS ORDERED** that ATS's motion for summary judgment (Doc. 57) is **granted in part and denied in part**. Summary judgment is granted in favor of ATS on Count Two but denied as to Counts Three, Four, and Five.

Dated this 18th day of August, 2023.

Dominic W. Lanza
United States District Judge